UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____

Wendy Brusseau,                           )
                                          )
                                          )
                Plaintiff                 )
                                          )          Docket No.
                                          )
                                          )
        v.                                )          **DEMAND FOR JURY TRIAL**
                                          )
Ralph Camputaro & Son Excavating, Inc.,   )
Dennis Camputaro,                         )
& Thomas Buzzi                            )
                                          )
                Defendants                )
_____)

### <u>COMPLAINT AND JURY DEMAND</u>

#### <u>Parties</u>

1.      Plaintiff Wendy Brusseau ("Ms. Brusseau" or "Plaintiff") is a female resident of the State of Connecticut, residing at 105 Basswood Drive, Middletown, CT 06457.

2.      Defendant Ralph Camputaro & Son Excavating, Inc. (the "Company") is a for profit corporation that, upon information and belief, is incorporated in the State of Connecticut and its principal office is located at 1 Enterprise Drive, North Branford, CT 06471.  During all relevant times, the Company did business within, and employed individuals in, the State of Connecticut, including Ms. Brusseau.

3.      Defendant, Dennis Camputaro ("Mr. Camputaro") is an adult male, who, upon information and belief, resides in Connecticut.  At all relevant times, Mr. Camputaro was the Company's President and Owner. Mr. Camputaro is named in both his individual and official capacities.

4.     Defendant, Thomas Buzzi ("Mr. Buzzi") is an adult male, who, upon information and belief, resides in Connecticut.  At all relevant times, Mr. Buzzi was the Company's Vice President. Mr. Buzzi is named in both his individual and official capacities (the Company, Mr. Camputaro, and Mr. Buzzi, collectively and individually, the "Defendants").

## Jurisdiction and Venue

5.     The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought claims pursuant to the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.* and the federal Family and Medical Leave Act (29 U.S.C. §2601 *et seq.*). The court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

6.     This court has personal jurisdiction over the Company because the Company is incorporated in the State of Connecticut and has a principal place of business in the State of Connecticut located at 1 Enterprise Drive, North Branford, CT 06471 (the "Principal Office"). The Company engaged in and transacted business in the State of Connecticut, including by owning, managing and/or operating an office in Connecticut and/or by employing the Plaintiff in Connecticut, and the Plaintiff's causes of action stem largely from business transactions and employment actions by the Company within the State of Connecticut.  Indeed, the Plaintiff was employed by the Company in the State of Connecticut, was managed and reprimanded by the Company in the State of Connecticut, and was terminated by the Company in the State of Connecticut.

7.     This court has personal jurisdiction over Mr. Camputaro because he is, upon information and belief, a resident of Connecticut.  Additionally, the Court has personal jurisdiction over Mr. Camputaro because Mr. Camputaro purposefully availed himself of Connecticut law by managing and operating a business in Connecticut, transacting business in

Connecticut, and/or supervising employees (including, during the times relevant to this Complaint, Ms. Brusseau) in Connecticut. Further, the claims at issue stem from and/or are related to Mr. Camputaro's contacts with the State of Connecticut.  Mr. Camputaro served in a supervisory capacity related to the Plaintiff in the state of Connecticut. Indeed, as president and owner of the Company, Mr. Camputaro was Plaintiff's managerial supervisor regarding Plaintiff's work assignments in the State of Connecticut. Plaintiff was therefore employed by Mr. Camputaro in the State of Connecticut, supervised and managed by Mr. Camputaro in the State of Connecticut, and was terminated by Mr. Camputaro in the State of Connecticut.

8.      This court has personal jurisdiction over Mr. Buzzi because he is, upon information and belief, a resident of Connecticut.  Additionally, the Court has personal jurisdiction over Mr. Buzzi because Mr. Buzzi purposefully availed himself of Connecticut law by managing and operating a business in Connecticut, transacting business in Connecticut, and/or supervising employees (including, during the times relevant to this Complaint, Ms. Brusseau) in Connecticut. Further, the claims at issue stem from and/or are related to Mr. Buzzi's contacts with the State of Connecticut.  Mr. Buzzi served in a direct supervisory capacity related to the Plaintiff in the state of Connecticut. Indeed, as vice president of the Company, Mr. Buzzi was Plaintiff's managerial supervisor for assignments and provided feedback and direction regarding Plaintiff's work assignments in the State of Connecticut. Plaintiff was therefore employed by Mr. Buzzi in the State of Connecticut, supervised and managed by Mr. Buzzi in the State of Connecticut, and was terminated by Mr. Buzzi in the State of Connecticut.

## Statement of Facts

9.      Or around January 31, 2018, Ms. Brusseau began employment for the Defendant as a receptionist.

10. Throughout her employment, Ms. Brusseau primarily worked out of the Defendant's Principal Office at 1 Enterprise Drive, North Branford, CT 06471.

11. At all relevant times, the Defendant employed 15 or more employees for 20 or more calendar weeks in the preceding 12 months.

12. Indeed, at all relevant times, the Company was engaged in an industry affecting commerce and employed 50 or more employees during 20 or more calendar weeks in each current and/or preceding calendar year.

13. Accordingly, the Company was a covered employer under the Family and Medical Leave Act ("FMLA").

14. At all relevant times, Ms. Brusseau was a qualified employee, and her job performance was satisfactory.

15. Ms. Brusseau, due to her satisfactory job performance, was in fact given additional responsibilities to perform as part of her job, such as accounts payable tasks, employee background checks, and HR tasks.

16. Prior to her employment with the Defendant, Ms. Brusseau was diagnosed with major depressive disorder, bipolar disorder, post-traumatic stress disorder (PTSD), recurring migraines, and chronic bronchitis.

17. At all relevant times, Ms. Brusseau's major depressive disorder was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, eating, caring for oneself, regulating emotions, and engaging in strenuous physical activity. Major depressive disorder further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological and emotional

functions. Accordingly, Ms. Brusseau was disabled under both federal law and Connecticut state law.

18.     At all relevant times, Ms. Brusseau's bipolar disorder was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, speaking, caring for oneself, and regulating emotions. Bipolar disorder further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under both federal law and Connecticut state law.

19.     At all relevant times, Ms. Brusseau's PTSD was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, eating, caring for oneself, regulating emotions, and engaging in strenuous physical activity. PTSD further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under both federal law and Connecticut state law.

20.     At all relevant times, Ms. Brusseau's recurring migraines were an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, thinking, and engaging in strenuous physical activity. Migraines further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under both federal law and Connecticut state law.

21.     At all relevant times, Ms. Brusseau's chronic bronchitis was an impairment which substantially limited one or more major life activities, including, but not limited to, breathing, lifting and engaging in strenuous physical activity. Chronic bronchitis further substantially

limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her respiratory functions. Accordingly, Ms. Brusseau was disabled under both federal law and Connecticut state law.

22.     The Defendant was unaware of Ms. Brusseau's disabilities at the time it offered her a position of employment.

23.     After her employment began with the Defendant, Ms. Brusseau was further diagnosed with diabetes.

24.     At all relevant times, Ms. Brusseau's diabetes was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, eating, and engaging in strenuous physical activity. Diabetes further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her immune system, digestive system, and nervous system. Accordingly, Ms. Brusseau was disabled under both federal law and Connecticut state law.

25.     After her employment with the Company began, the Defendant became aware of Ms. Brusseau's disabilities.

26.     Indeed, Ms. Brusseau disclosed her diabetes diagnosis to both the administrative assistant (who was hierarchically above Ms. Brusseau and served as her direct supervisor), Cynthia Farrell ("Ms. Farrell") and the safety director, Don Hulk ("Mr. Hulk").

27.     Ms. Brusseau further discussed her recurring migraines with Ms. Farrell, as her migraines, when they flared up, left Ms. Brusseau reeling in shock and pain.

28.     Additionally, Ms. Brusseau discussed her other preexisting disabilities with Ms. Farrell and Mr. Hulk as well.

29.     Indeed, Ms. Farrell knew of Ms. Brusseau's mental disabilities. If Ms. Brusseau ever spoke in a low tone or without what Ms. Farrell deemed to be enough cheer, Ms. Farrell would make sarcastic harassing comments such as "oh, it's one of those days" to Ms. Brusseau (a reference to a flareup or perceived flareup of her mental disabilities).

30.     Ms. Brusseau was not shy in discussing her disabilities with her coworkers, and it became known amongst her peers in the workplace that Ms. Brusseau suffered from one or more disabilities.

31.     For instance, Ms. Brusseau discussed her disabilities, including diabetes and depression, with a similarly situated coworker, Donna Smith ("Ms. Smith").

32.     Due to Ms. Brusseau's diabetes, she was required to administer a blood sugar test twice per day, occasionally during working hours, in order to monitor her blood sugar levels. Ms. Brusseau sometimes administered this test in the breakroom or her work area, in full view of her coworkers, including on occasion Ms. Farrell.

33.     Indeed, Ms. Brusseau discussed with Ms. Farrell the reasonable accommodation of allowing Ms. Brusseau to take brief breaks on Company property in order to test her own blood sugar level.

34.     Ms. Brusseau also made use of a medicated inhaler (for her chronic bronchitis disability and/or when having difficulty breathing due to symptoms of her PTSD) in full view of some of her coworkers, such as Ms. Smith and Ms. Farrell.

35.     Due to her continuing treatment needs related to her diabetes, Ms. Brusseau requested the reasonable accommodation from Ms. Farrell of approximately one half-day off a month in order to attend doctor's appointments for regular checkups of her diabetes disability.

36.     Ms. Farrell became annoyed at Ms. Brusseau's request, and demonstrated this annoyance in a number of ways, including by sighing heavily and sarcastically muttering was about the fact that Ms. Brusseau needed to attend medical appointments. Nevertheless, Ms. Farrell begrudgingly granted this reasonable disability-related accommodation.

37.     On or around April 26, 2020, Ms. Brusseau began developing blisters along the left side of her abdomen, which caused pinching pain and itchiness.

38.     Fearing that this pain was related to one of her existing disabilities, Ms. Brusseau sought medical care from her clinic.

39.     On or around April 26, 2020, Ms. Brusseau was diagnosed with shingles (a chronic viral infection caused by long-term effects of the same virus that causes chicken pox and which causes painful, burning blisters and can impair the immune system).

40.     At all relevant times, Ms. Brusseau's shingles was an impairment which substantially limited one or more major life activities, including, but not limited to, bending, lifting, walking, sitting, and engaging in strenuous physical activity. Shingles further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her immune system, integumentary system, and muscular system. Accordingly, Ms. Brusseau was disabled under both federal law and Connecticut state law.

41.     Notably, Ms. Brusseau's preexisting disabilities, including diabetes, made her more susceptible to developing recurring shingles symptoms.

42.     Some of Ms. Brusseau's recurring shingles-related symptoms were burning in her extremities, fluid-filled blisters, and an inflamed rash.

43.     Ms. Brusseau's disability symptoms substantially limited some of her major life activities, such as sitting. For instance, due to the nature and placement of her blisters, sitting in a

sedentary manner for more than 20 to 30 minutes at a time became painful due to the added pressure on her blisters.

44.     Ms. Brusseau's shingles, in tandem with her other disabilities, contributed to a weakened and susceptible immune system, and as such her shingles disability left Ms. Brusseau at higher risk of contracting serious disease or illness.  Ms. Brusseau's shingles thus, both on their own and together with her other disabilities, also substantially limited one or more major bodily functions, including but not limited to, her immune system function.

45.     On or around April 27, 2020, Ms. Brusseau returned to her employment after her diagnosis.

46.     On or around April 28, 2020, Ms. Brusseau again experienced a flareup of her shingles and developed a string of burning rashes on her body. In an effort to alleviate the pain of her shingles symptoms, Ms. Brusseau sat in her chair in a different posture than usual (in an effort to avoid aggravating her shingles-related blisters).

47.     Ms. Farrell noticed Ms. Brusseau's posture and questioned her on it, at which point Ms. Brusseau then disclosed her shingles diagnosis.

48.     Mr. Hulk, who was nearby, was likewise privy to Ms. Brusseau's shingles disability disclosure.

49.     Ms. Brusseau requested the reasonable accommodation of being allowed to sit in a specific posture on her chair (a relaxed manner in her chair) and/or get up to take occasional brief walks in order to alleviate the burning shingles-related blisters.

50.     However, Ms. Farrell made a disgusted face when Ms. Brusseau disclosed her shingles disability, and she ordered Ms. Brusseau to leave the premises (importantly, shingles is

not a contagious disability and Ms. Brusseau's disabilities did not impede her ability to perform the essential functions of her job).

51.     Ms. Farrell clearly denied Ms. Brusseau's reasonable accommodation requests of sitting in a certain posture in her chair and taking brief walking breaks.

52.     Ms. Brusseau raised protected concerns to Ms. Farrell that her requests were improperly denied.

53.     Indeed, Ms. Brusseau further raised concerns that her disabilities did not warrant her being sent home as she was able to perform the essential functions of her job, especially if the Company would grant her request for relatively minor accommodations.

54.     In fact, Ms. Brusseau mentioned that her doctor had cleared her to come to work and she could otherwise provide a note stating such.

55.     Ms. Farrell then brought Mr. Hulk over to enter the conversation.

56.     Mr. Hulk began talking in a denigrating fashion about his belief that due to Ms. Brusseau disability(ies), her immune system was compromised and said for those reasons she should not be at work. Indeed, he muttered about Ms. Brusseau's shingles and diabetes disabilities, and said that because of the coronavirus pandemic, he believed she should not be allowed to be at work.

57.     Ms. Brusseau raised protected concerns to Mr. Hulk over his harassing comments due to her disabilities and that her requests for accommodations were being denied.

58.     Mr. Hulk then left to have a conversation upstairs, where the offices of both the president of the Company, Mr. Camputaro, and the vice president of the Company, Mr. Buzzi, are located.

59.     Upon information and belief, Mr. Hulk additionally disclosed Ms. Brusseau's range of disabilities to both Mr. Camputaro and Mr. Buzzi, and, upon further information and belief, the three discussed her continued employment (and potential adverse actions) in light of her disabilities.After some delay, Mr. Hulk returned from the area where Mr. Camputaro's and Mr. Buzzi's offices were located, followed closely in tow by Mr. Buzzi.

60.     Mr. Buzzi then approached Ms. Brusseau in the workplace and talked to her about her disabilities, indeed mentioning one or more of her disabilities (including shingles) directly, making it apparent that Mr. Buzzi had been already informed about Ms. Brusseau's disabilities.

61.     Mr. Buzzi asked Ms. Brusseau if her shingles disclosure was going to affect her activity, particularly in light of her previously disclosed disabilities to the Company.

62.     Ms. Brusseau told Mr. Buzzi her disabilities would not impede her ability to perform her job duties. In fact, Ms. Brusseau explained she was seeking ongoing treatment for her disabilities, including her shingles, and the ways in which her disabilities, including shingles, were otherwise substantially limiting major life activities.

63.     Mr. Buzzi asked in a pointed fashion whether Ms. Brusseau felt she should be working in light of her disabilities during the coronavirus pandemic (making it clear Mr. Buzzi was focused on Ms. Brusseau due to her disabilities).

64.     Ms. Brusseau made clear that she wanted, needed, and was able to keep working and voiced protected concerns to Mr. Buzzi about his questioning of her disabilities.  She further raised concerns over how she felt discriminated against due to her disabilities.

65.     Ms. Brusseau again offered to provide a doctor's note explaining she was able to continue working.

66.    Mr. Buzzi ignored this statement and then cut the meeting short. Mr. Buzzi then went to the area where Mr. Camputaro's office was located.

67.    Later that day (April 28, 2020), Mr. Buzzi contacted Ms. Brusseau and informed her that the Company was taking her off of the work schedule effective immediately and would accordingly not allow her to work.

68.    Mr. Buzzi said to Ms. Brusseau that although she was temporarily being taken off of the work schedule, she would be allowed to return after her shingles disability symptoms faded (making it clear that she was being laid off because of her disability(ies)).

69.    Accordingly, the Company made clear that Ms. Brusseau was being forced out on an involuntary disability-related leave of absence from work due to her disabilities.

70.    At all relevant times, the Company was engaged in an industry affecting commerce and employed 50 or more employees within 75 miles of Ms. Brusseau's worksite.

71.    Furthermore, at all relevant times, Ms. Brusseau had been an employee for at least 12 months and had worked in excess of 1250 hours during the preceding 12-month period. As such, Ms. Brusseau was an eligible employee for leave protected under the FMLA.  Likewise, Ms. Brusseau was entitled to FMLA leave.

72.    Accordingly, Ms. Brusseau's disability-related leave of absence was further an eligible FMLA-protected leave and was protected under the FMLA.  Indeed, Ms. Brusseau made clear that, although she wanted to be allowed to continue working, since the Company was refusing to let her work, then in the alternative she wanted to be allowed to utilize an (involuntary) leave of absence related to her disabilities and to be allowed to return to work and restored to her position as soon as the Company would permit it.

73.     Ms. Brusseau's involuntary leave was notably an unpaid leave from the Company and amounted to an unpaid suspension.

74.     By mid-May, 2020, Ms. Brusseau's shingles-related symptoms had improved and her flare-up had subsided.

75.     On or around May 19, 2020, Ms. Brusseau contacted Ms. Farrell and asked to be allowed to return to work as her shingles disability flare-up symptoms had largely subsided.

76.     Ms. Farrell said she would pass the message along "to the boss," and thereby indicated she was informing Mr. Camputaro (who was known as the "boss"), as well as Mr. Buzzi.

77.     Indeed, Mr. Camputaro, as owner and president, had ultimate authority in all hiring and firing decisions and indeed, upon information and belief, was involved in the Company's hiring and firing decisions, including making and/or approving all hiring and firing decisions.

78.     In fact, on one occasion, Ms. Farrell informed Ms. Brusseau that all employment personnel decisions had to be run by Mr. Camputaro.

79.     Upon information and belief, Mr. Camputaro knew about Ms. Brusseau's disabilities and her accommodation requests.

80.     Shortly after speaking to Ms. Farrell, Mr. Buzzi contacted Ms. Brusseau and noted that he was aware that Ms. Brusseau had asked to return to work.

81.     However, Mr. Buzzi refused to let her return to work and likewise refused to restore her to her position.

82.     Ms. Brusseau expressed protected concerns that the Company was improperly denying her the right of restoration and the accommodation of being allowed to return from her involuntary unpaid disability leave.

83.     Mr. Buzzi then alleged, for the first time, that Ms. Brusseau's position was supposedly being eliminated due to alleged lack of need.

84.     Mr. Buzzi further declined to engage in any interactive dialogue with Ms. Brusseau regarding her disability-related accommodations, as well as her request to be allowed to return to work and to be restored to her position following FMLA-protected leave.

85.     Mr. Buzzi made clear that Ms. Brusseau was being fired by the Company. Accordingly, Ms. Brusseau was involuntarily terminated from her employment on May 19, 2020.

86.     Notably, no one else was laid off from the Company around this time due to alleged lack of need.

87.     Indeed, shortly after Ms. Brusseau was terminated by Mr. Buzzi, she visited the Principal Office to gather her belongings and noticed a replacement employee sitting at her old desk, performing her duties.

88.     Upon information and belief, Ms. Brusseau was replaced in her position by a non-disabled employee.

89.     Indeed, upon information and belief, Mr. Camputaro and Mr. Buzzi made the decisions to take all relevant adverse actions against Ms. Brusseau, including the decisions to refuse to let her return from (involuntary) leave and the decision to terminate her employment.

90.     On or around October 14, 2020, Ms. Brusseau timely filed a Charge of Discrimination with the Connecticut Commission on Human Rights and Opportunities

("CHRO"), which was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

91.     On or around March 26, 2021, Ms. Brusseau informed the CHRO of her intent to remove her charge in order to pursue her claims in court and accordingly requested that the CHRO release jurisdiction.

92.     On or around March, 29, 2021, the CHRO issued Ms. Brusseau a release of jurisdiction to allow her to pursue her claims in court.

93.     On or around April 2, 2021, the EEOC provided Ms. Brusseau with a Notice of a Right to Sue letter.

94.     This Complaint is timely filed in compliance with the timeframes of relevant laws and requirements.


**COUNT I**

**(Failure to Accommodate and Disability Discrimination in Violation of Conn. Gen. Stat. §**

**46(a)-60)**

**Ms. Brusseau v. the Company**

95.     Ms. Brusseau incorporates all paragraphs above and below as if set forth fully herein.

96.     At all relevant times, the Company employed three or more employees.

97.     Accordingly, the Company is an employer as defined by Conn. Gen. Stat. § 46(a)-60.

98.     Ms. Brusseau was a qualified individual who was capable of performing all essential functions of her position, with or without disability-related accommodations.

99.    Ms. Brusseau suffers (and at all relevant times suffered) from one or more mental disabilities, including major depressive disorder, bipolar disorder, and PTSD.

100.    At all relevant times, Ms. Brusseau's major depressive disorder was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, eating, thinking, and engaging in strenuous physical activity. Major depressive disorder further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under Conn. Gen. Stat. § 46(a)-81.

101.    At all relevant times, Ms. Brusseau's bipolar disorder was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, speaking, and thinking rationally. Bipolar disorder further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under Conn. Gen. Stat. § 46(a)-81.

102.    At all relevant times, Ms. Brusseau's PTSD was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, eating, thinking rationally, and engaging in strenuous physical activity. PTSD further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under Conn. Gen. Stat. § 46(a)-81.

103.    Ms. Brusseau further suffers (and at all relevant times suffered) from one or more physical disabilities, including recurring migraines, chronic bronchitis, diabetes, and shingles.

104.    At all relevant times, Ms. Brusseau's recurring migraines was an impairment which substantially limited one or more major life activities, including, but not limited to,

sleeping, thinking, and engaging in strenuous physical activity. Major depressive disorder further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under Conn. Gen. Stat. § 46(a)-81.

105.    At all relevant times, Ms. Brusseau's chronic bronchitis was an impairment which substantially limited one or more major life activities, including, but not limited to, breathing, lifting and engaging in strenuous physical activity. Chronic bronchitis further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her respiratory functions. Accordingly, Ms. Brusseau was disabled under Conn. Gen. Stat. § 46(a)-81.

106.    At all relevant times, Ms. Brusseau's diabetes was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, eating, and engaging in strenuous physical activity. Diabetes further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her immune system, digestive system, and nervous systemem. Accordingly, Ms. Brusseau was disabled under Conn. Gen. Stat. § 46(a)-81.

107.    At all relevant times, Ms. Brusseau's shingles was an impairment which substantially limited one or more major life activities, including, but not limited to, bending, lifting, walking, sitting, and engaging in strenuous physical activity. Shingles further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her immune system, integumentary system and muscular system. Accordingly, Ms. Brusseau was disabled under Conn. Gen. Stat. § 46(a)-81.

108.    At all relevant times, Ms. Brusseau was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

109.    Ms. Brusseau disclosed her disability(ies) to Defendant, the Defendant knew about Ms. Brusseau's disability(ies), and/or Defendant regarded Ms. Brusseau as disabled.

110.    Ms. Brusseau requested disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job.  These requested reasonable accommodations included but were not limited to: (i) intermittent leave to attend treatment appointments for disability-related follow-up care; (ii) one or more disability-related medical leaves; (iii) being allowed to be restored to her position following disability-related leave; (iv) sitting in a specific posture on a chair; (v) being allowed small breaks on the Company premises to perform blood sugar tests; and/or (vi) taking brief walking breaks to alleviate symptoms of one or more disabilities.

111.    The Company improperly denied one or more of Ms. Brusseau's requested disability-related accommodations.

112.    The Company failed to engage in an interactive dialogue related to some or all of Ms. Brusseau's reasonable accommodation requests.

113.    Ms. Brusseau's requested disability-related accommodations did not pose an undue burden on Defendant.

114.    Ms. Brusseau would have remained capable of performing the essential functions of her position even if some or all of her requested accommodations had been granted.

115.    The reasonable accommodations that Ms. Brusseau requested, and which Defendant improperly denied, would have assisted Ms. Brusseau in performing the essential

functions of her job and/or would have allowed her to perform the essential functions of her job without experiencing significant pain or discomfort.

116.    The Company discriminated against Ms. Brusseau due to her disability(ies) by subjecting Ms. Brusseau to adverse actions, including, but not limited to, a harassing and retaliatory environment, the denial of disability-related accommodations, an unpaid involuntary leave of absence which amounted to an unpaid suspension, the denial of restoration to her position, and the termination of Ms. Brusseau's employment.

117.    Upon information and belief, the Company replaced Ms. Brusseau with a lesser or similarly qualified, non-disabled employee.

118.    The  Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Brusseau and/or conduct so reckless to amount to such disregard.

119.    As a direct and proximate result of the Company's violation of Conn. Gen. Stat. § 46(a)-81, Ms. Brusseau has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

120.    Ms. Brusseau seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

**COUNT II**

**(Failure to Accommodate and Disability Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.*)**

**Ms. Brusseau v. The Company**

121.    Ms. Brusseau incorporates all paragraphs above and below as if set forth fully herein.

122.    Ms. Brusseau was a qualified individual who was capable of performing all essential functions of her position, with or without disability-related accommodations.

123.    Ms. Brusseau suffers (and at all relevant times suffered) from one or more mental disabilities, including major depressive disorder, bipolar disorder, and PTSD.

124.    At all relevant times, Ms. Brusseau's major depressive disorder was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, eating, thinking, and engaging in strenuous physical activity. Major depressive disorder further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under the ADA.

125.    At all relevant times, Ms. Brusseau's bipolar disorder was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, speaking, and thinking rationally. Bipolar disorder further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under the ADA.

126.    At all relevant times, Ms. Brusseau's PTSD was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping,

eating, thinking rationally, and engaging in strenuous physical activity. PTSD further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under the ADA.

127.   Ms. Brusseau further suffers (and at all relevant times suffered) from one or more physical disabilities, including recurring migraines, chronic bronchitis, diabetes, and shingles.

128.   At all relevant times, Ms. Brusseau's recurring migraines was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, thinking, and engaging in strenuous physical activity. Major depressive disorder further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her neurological functions. Accordingly, Ms. Brusseau was disabled under the ADA.

129.   At all relevant times, Ms. Brusseau's chronic bronchitis was an impairment which substantially limited one or more major life activities, including, but not limited to, breathing, lifting and engaging in strenuous physical activity. Chronic bronchitis further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her respiratory functions. Accordingly, Ms. Brusseau was disabled under the ADA.

130.   At all relevant times, Ms. Brusseau's diabetes was an impairment which substantially limited one or more major life activities, including, but not limited to, sleeping, eating, and engaging in strenuous physical activity. Diabetes further substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her immune system, digestive system, and nervous system. Accordingly, Ms. Brusseau was disabled under the ADA.

131.   At all relevant times, Ms. Brusseau's shingles was an impairment which substantially limited one or more major life activities, including, but not limited to, bending, lifting, walking, sitting, and engaging in strenuous physical activity. Shingles further

substantially limited one or more of Ms. Brusseau's major bodily functions, including but not limited to her immune, integumentary system and muscular system. Accordingly, Ms. Brusseau was disabled under the ADA.

132.     At all relevant times, Ms. Brusseau was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

133.     Ms. Brusseau disclosed her disability to the Company, the Company knew about Ms. Brusseau's disability(ies), and/or the Company regarded Ms. Brusseau as disabled.

134.     Ms. Brusseau requested disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job.  These requested reasonable accommodations included but were not limited to: (i) intermittent leave to attend treatment appointments for disability-related follow-up care; (ii) one or more disability-related medical leaves; (iii) being allowed to be restored to her position following disability-related leave; (iv) sitting in a specific posture on a chair; (v) being allowed small breaks on the Company premises to perform blood sugar tests; and/or (vi) taking brief walking breaks to alleviate symptoms of one or more disabilities.

135.     The Company improperly denied one or more of Ms. Brusseau's requested disability-related accommodations.

136.     The Company failed to engage in an interactive dialogue related to some or all of Ms. Brusseau's reasonable accommodation requests.

137.     Ms. Brusseau's requested disability-related accommodations did not pose an undue burden on the Company.

138.    Ms. Brusseau would have remained capable of performing the essential functions of her position even if some or all of her requested accommodations had been granted.

139.    The reasonable accommodations that Ms. Brusseau requested, and which the Company improperly denied, would have assisted Ms. Brusseau in performing the essential functions of her job and/or would have allowed her to perform the essential functions of her job without experiencing significant pain or discomfort.

140.    The Company discriminated against Ms. Brusseau due to her disability(ies) by subjecting Ms. Brusseau to adverse actions, including, but not limited to, a harassing and retaliatory environment, the denial of disability-related accommodations, an unpaid involuntary leave of absence which amounted to an unpaid suspension, the denial of restoration to her position, and the termination of Ms. Brusseau's employment.

141.    Upon information and belief, the Company replaced Ms. Brusseau with a lesser or similarly qualified, non-disabled employee.

142.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Brusseau.

143.    As a direct and proximate result of the Company's violation of the ADA, Ms. Brusseau has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

144.    Ms. Brusseau seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT III

### (Retaliation in Violation of Conn. Gen. Stat. § 46a-60)

### Ms. Brusseau v. The Company

145.    Ms. Brusseau incorporates all paragraphs above and below as if set forth fully herein.

146.    Ms. Brusseau engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to, by (i) requesting and/or utilizing reasonable accommodations for her disabilities, (ii) by expressing protected concerns that she was being improperly denied requested disability-related reasonable accommodations, (iii) by expressing protected concerns that the Company was failing to engage in an adequate interactive dialogue related to her disability-related accommodation requests, and/or by (iv) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Brusseau's disabilities.

147.    The Company retaliated against Ms. Brusseau for engaging in protected activity, including, but not limited to, the aforementioned protected activity, by subjecting Ms. Brusseau to adverse actions, including, but not limited to, a harassing and retaliatory environment, the denial of disability-related accommodations, an unpaid involuntary leave of absence which amounted to an unpaid suspension, the denial of restoration to her position, and the termination of Ms. Brusseau's employment.

148.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Brusseau and/or conduct so reckless to amount to such disregard.

149.    As a direct and proximate result of the Company' violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

150.    Ms. Brusseau seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.


**COUNT IV**

**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.*)**

**Ms. Brusseau v. the Company**

151.    Ms. Brusseau incorporates all paragraphs above and below as if set forth fully herein.

152.    Ms. Brusseau engaged in protected activity under the ADA, including, but not limited to by (i) requesting and/or utilizing reasonable accommodations for her disability, (ii) by expressing protected concerns that he was being improperly denied requested reasonable accommodations, (iii) by expressing protected concerns that the Company was failing to engage

in an adequate interactive dialogue related to her disability-related accommodation requests, and/or by (iv) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Brusseau's disability.

153.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Brusseau's exercising of, or enjoyment of, one or more rights granted by the ADA.

154.    More specifically, the Company retaliated against Ms. Brusseau for engaging in protected activity, including, but not limited to, the aforementioned protected activity, by subjecting Ms. Brusseau to adverse actions, including, but not limited to, a harassing and retaliatory environment, the denial of disability-related accommodations, an unpaid involuntary leave of absence which amounted to an unpaid suspension, the denial of restoration to her position, and the termination of Ms. Brusseau's employment.

155.    The Company willfully violated the ADA because the Company knew or should have known its conduct was prohibited by Federal law and/or the Company acted with malice and/or reckless indifference to the federally protected rights of Ms. Brusseau.

156.    As a direct and proximate result of the Company' violation of the ADA, Ms. Brusseau has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages. s

157.    Ms. Brusseau seeks all damages to which he is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish,

loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT V

### (Interference with Rights Under the Family and Medical Leave Act – 29 U.S.C. § 2615)

### Ms. Brusseau v. All Defendants (the Company, Mr. Camputaro, and Mr. Buzzi)

158.   Ms. Brusseau incorporates all paragraphs above and below as if set forth fully herein.

159.   The Defendants are (and at all relevant times were) engaged in an industry affecting commerce.

160.   The Defendants employed 50 or more employees during 20 or more calendar weeks in each current and/or preceding calendar year.

161.   Accordingly, the Defendants were a covered employer under the FMLA.

162.   Ms. Brusseau was an eligible employee under the FMLA because at all relevant times she had worked for the Defendants for 12 or more months and had worked in excess of 1,250 hours within the past 12-month period.

163.   In addition, the Defendants employed 50 or more employees within 75 miles of the worksite in North Branford, Connecticut at which Ms. Brusseau was based.

164.   Ms. Brusseau suffered from one or more serious health conditions which required inpatient care at a hospital or continuing treatment by a healthcare provider, including, but not limited to, diabetes, shingles, chronic bronchitis, recurring migraines, major depressive disorder, PTSD, and bipolar disorder.

165.     Ms. Brusseau went on one or more FMLA-eligible protected disability-related leaves of absence due to her serious health conditions for the purposes of seeking care and/or recovering.

166.     The Defendants interfered with, restrained, and/or denied the exercise of, or the attempted exercise of, Ms. Brusseau's rights under the FMLA.

167.     For example, the Defendants, including through their agents, refused to restore Ms. Brusseau to her position or a substantially similar position following recovery from her serious health conditions and her request to be restored to her position.

168.     Likewise, Defendants forced Ms. Brusseau to utilize an involuntary (albeit FMLA protected) leave and refused to let her return from this leave before her Shingles symptoms disappeared, even though she requested to be allowed to continue working.

169.     Further, Defendants terminated Ms. Brusseau while she was actively out on an eligible and protected FMLA leave and thereby denied her the right to continue to the end of her eligible leave period of 12 weeks.

170.     Indeed, Defendants terminated Ms. Brusseau exactly because she was attempting to exercise the right of job restoration and essentially terminated her specifically so that she would be deprived of her rights to continued leave and/or job restoration.

171.     In terminating Ms. Brusseau, the Defendants unlawfully interfered with Ms. Brusseau's protected right to FMLA leave and subsequent right to job restoration.

172.     Mr. Camputaro was an employer of Ms. Brusseau under the FMLA because he had the power to hire and/or fire Ms. Brusseau, supervised and controlled Ms. Brusseau's conditions of employment including her work schedule, played a role in determining Ms.

Brusseau's rate and method of payment, and/or played a role in maintaining Ms. Brusseau's employment records.

173.    Furthermore, upon information and belief, Mr. Camputaro, alone or with others, made the decisions and took the actions that constituted interference with Ms. Brusseau's FMLA rights, as well as retaliation against Ms. Brusseau for the utilization of FMLA leave.  For example, upon information and belief, Mr. Camputaro decided not to restore Ms. Brusseau to her position and to terminate her employment.

174.    Mr. Buzzi was an employer of Ms. Brusseau under the FMLA because he had the power to hire and/or fire Ms. Brusseau, supervised and controlled Ms. Brusseau's conditions of employment including her work schedule, played a role in determining Ms. Brusseau's rate and method of payment, and/or played a role in maintaining Ms. Brusseau's employment records.

175.    Furthermore, upon information and belief, Mr. Buzzi, alone or with others, made the decisions and took the actions that constituted interference with Ms. Brusseau's FMLA rights, as well as retaliation against Ms. Brusseau for the utilization of FMLA leave.  For example, upon information and belief, Mr. Buzzi decided not to restore Ms. Brusseau to her position and to terminate her employment.

176.    The Defendants' actions were willful and in bad faith.

177.    As a direct and proximate result of the Defendants' violation of the FMLA, Ms. Brusseau has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

178.    Ms. Brusseau seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other

monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, liquidated (i.e. double) damages, interest, attorney's fees, and costs.

## COUNT VI

### (Retaliation for Exercising Rights under the Family Medical Leave Act – 29 U.S.C. §2615)

### Ms. Brusseau v. All Defendants (the Company, Mr. Camputaro and Mr. Buzzi)

179.    Ms. Brusseau incorporates all paragraphs above and below as if set forth fully herein.

180.    Ms. Brusseau exercised her rights under the FMLA, including by requesting protected leaves under the FMLA and/or utilizing leaves protected under the FMLA.

181.    Ms. Brusseau raised protected concerns to the Defendants about their improper refusal to let her return from leave and their improper failure to restore her to her position.

182.    The Defendants, including by and through their agents, retaliated and/or discriminated against Ms. Brusseau for engaging in protected activities, including for raising protected concerns about conduct that violated the FMLA, as well as for requesting, for seeking to exercise, and for utilizing FMLA leave and the FMLA right to job restoration.

183.    The Defendants retaliated and/or or discrimination against Ms. Brusseau for engaging in protected activities by subjecting Ms. Brusseau to adverse actions, including, but not limited to, a harassing and retaliatory environment, the denial of disability-related accommodations, an unpaid involuntary leave of absence which amounted to an unpaid

suspension, the denial of restoration to her position, and the termination of Ms. Brusseau's employment.

184.     Mr. Camputaro was an employer of Ms. Brusseau under the FMLA because he had the power to hire and/or fire Ms. Brusseau, supervised and controlled Ms. Brusseau's conditions of employment including her work schedule, played a role in determining Ms. Brusseau's rate and method of payment, and/or played a role in maintaining Ms. Brusseau's employment records.

185.     Furthermore, upon information and belief, Mr. Camputaro, alone or with others, made the decisions and took the actions that constituted interference with Ms. Brusseau's FMLA rights, as well as retaliation against Ms. Brusseau for the utilization of FMLA leave.  For example, upon information and belief, Mr. Camputaro decided not to restore Ms. Brusseau to her position and to terminate her employment.

186.     Mr. Buzzi was an employer of Ms. Brusseau under the FMLA because he had the power to hire and/or fire Ms. Brusseau, supervised and controlled Ms. Brusseau's conditions of employment including her work schedule, played a role in determining Ms. Brusseau's rate and method of payment, and/or played a role in maintaining Ms. Brusseau's employment records.

187.     Furthermore, upon information and belief, Mr. Buzzi, alone or with others, made the decisions and took the actions that constituted interference with Ms. Brusseau's FMLA rights, as well as retaliation against Ms. Brusseau for the utilization of FMLA leave.  For example, upon information and belief, Mr. Buzzi decided not to restore Ms. Brusseau to her position and to terminate her employment.

188.     The Defendants' actions were willful and undertaken in bad faith.

189.    As a direct and proximate result of the Defendants' violation of the FMLA, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

190.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, liquidated (i.e. double) damages, interest, attorney's fees, and costs.

WHEREFORE, the Plaintiff, Wendy Brusseau, respectfully requests that this honorable court:

A. Schedule this matter for trial by jury;

B. Find the Defendant liable on all counts;

C. Award the Plaintiff her lost compensation and benefits (including, but not limited to, back pay and front pay);

D. Award the Plaintiff other monetary damages, including damages for her diminished earning capacity and injury to reputation;

E. Award the Plaintiff damages for emotional distress and other mental and emotional pain and suffering;

F.  Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

G.  Award the Plaintiff punitive damages;

H.  Award the Plaintiff liquidated damages;

I.  Award the Plaintiff her reasonable attorney's fees;

J.  Award the Plaintiff interest and costs;

K.  Award the Plaintiff all other damages to which she is entitled; and

L.  Grant such further relief as is just and equitable.

Respectfully Submitted,

Wendy Brusseau

By her attorneys,

THE LAW OFFICES OF WYATT &
ASSOCIATES P.L.L.C

Date: April 30, 2021                    By:    __/s/ Chandan Panigrahi_____

Benjamin J. Wyatt, ct29994
BWyatt@Wyattlegalservices.com

Michael Varraso, ct30777
MVarraso@Wyattlegalservices.com

Chandan Panigrahi, ct31015
Chandan@Wyattlegalservices.com

The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868